# Hammett *versus* Philadelphia.

1. The legislature may confer upon municipal corporations the power of assessing the cost of local improvements upon the properties benefited.
2. This is a species of taxation—not taking property by the right of eminent domain.
3. It is a question not of right, but of expediency, of which the legislature are the competent and exclusive judges.
4. The rule is, local taxation for local purposes, or taxation on the benefits conferred but not beyond them.
5. The legislature by its general powers cannot levy or authorize a municipality to levy a local tax for general purposes.
6. Taxation exacts money or services from individuals as their respective shares of contribution to any public burden.
7. Property taken by the right of eminent domain, is so much beyond the individual's share of the public burden.
8. Every presumption is to be made in favor of the right of taxation.
9. If the case is within the principle of taxation, the proportion of contribution and other details are within the discretion of the taxing power.
10. The assessment when made in pursuance of law, is final and conclusive and cannot be reviewed by any other tribunal.
11. The original paving of a street is a local improvement and is within the principle of assessing the cost on the lots lying upon it.
12. When a street is opened and paved, thus assimilated with the rest of the city and made part of it, all the particular benefits to the locality derived from the improvements have been received and enjoyed.
13. Repairing streets is part of the duty of a municipality, for the general good.
14. Broad street in Philadelphia is a street a portion of which is paved under authority of law. An Act of Assembly required the city to occupy the street "for its entire length for the uses and purposes of a public drive, carriage-way, street or avenue, or portions thereof, in whole or in part, * * * with such mode of pavement," &c., as might in the judgment of the councils be best adapted for the uses aforesaid and ordained that the "cost of said improvements be paid for by the owners of property abutting on said street," &c. *Held*, that the act is unconstitutional and void, so far as it authorizes the councils to enact ordinances with such conditions as may require the cost of the improvements to be paid by the owners of property abutting on the street.

March 15th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the District Court of *Philadelphia*: No 152, to January Term 1869.

This was a scire facias sur municipal claim by the City of Philadelphia, to the use of Charles E. Jenkins and Jonathan Taylor, against Barnabas Hammett, issued July 18th 1868.

[Hammett *v.* Philadelphia.]

The claim on which the writ was founded was filed March 26th 1868, against the defendant, "owner of all that certain lot or piece of ground, with the buildings and improvements thereon erected, situate at the south-west corner of Broad and Poplar streets, for $1007\frac{26}{100}$ square yards of Nicolson pavement, done and laid in front of the premises above described, in Broad street, on the 27th day of November 1867, pursuant to the authority of 'An Act supplementary to an Act to incorporate the City of Philadelphia, authorizing the improvement of Broad street in said city,' approved March 23d 1866, and of 'An Ordinance authorizing the paving of a portion of Broad street with Nicolson pavement,' approved July 5th 1867, at the rate of four dollars per square yard, or the sum of $4029.04, and for five per cent., &c.

To this scire facias the defendant filed an affidavit of defence, the material parts of which are as follows:—

Broad street, at the part described in the claim, in front of the premises owned by this deponent, was, at the time of making the contract for paving the same by Jenkins and Taylor and of doing the work thereunder for which the claim is filed, well paved with cobble stones in the style universally adopted for years past in this city for the best paved avenues, and such pavement was then in good order and condition, with every probability of it so continuing: it had been laid by the city and her authorized agents, of their own option at the time they saw fit and in such mode and with such material as they chose to select, irrespective of any wish of the then owner of the premises, and the entire expenses thereof both of the materials for the pavement and the laying of the same, were paid by the then owner of the said real estate to the city and her agents at their request, and in obedience to the laws authorizing the pavement of the streets. Afterwards and while the pavement laid by the city at the expense of the owner of the premises was in good order, the city of Philadelphia entered into a contract with said Jenkins and Taylor, under which the plaintiffs did the work for the price of which the said claim is filed and this suit is brought. The said contract was made in pursuance of an ordinance of the councils of the said city, approved by the mayor on the 5th day of July 1867, and is, as deponent is advised, of no force or validity. * * *

Deponent further avers that he is advised by his counsel that the said ordinance and the Act of Assembly approved March 23d 1866, are respectively null and void by reason of their being in violation of the constitution of the state of Pennsylvania: in this respect, that they authorize the taking of the property of deponent and the application of it to the public use and payment of a debt of the city without the consent and against the wish

[Hammett *v.* Philadelphia.]

of deponent, and without the making of any compensation whatever or in any way securing that any shall be made.

Deponent is further advised that the said Act of Assembly is unconstitutional and therefore void, in this: that it delegates to the councils of the city, power to impose upon certain persons owners of certain properties facing a public avenue, the entire burden of a general unrestricted work to be undertaken, in the words of the preamble, " for the uses and purposes of the public and the benefits and advantages which will enure to them," when those properties had already been subjected to the contribution for paving usual to all other city properties.

The 1st section of the Act of Assembly of March 23d 1866, is as follows :—

That the city of Philadelphia be authorized and empowered and required to occupy Broad street, in the city of Philadelphia, for its entire length, as the same is now opened or may hereafter be opened, and from curb to curb thereof, except as hereinafter provided, for the uses, and purposes of a public drive, carriage way, street or avenue, and to improve the said street, or portions thereof, from time to time, and in whole or in part, with such mode of pavement, paving, macadamizing, gravelling or other roadway, as may, in the judgment of the Select and Common Councils of said city, be best adapted to and for the uses and purposes aforesaid ; and for that purpose the said councils shall have, and are hereby authorized to enact such ordinances or resolutions, with such conditions or stipulations as may require the cost of said improvements to be paid for by the owners of property abutting upon said street: Provided, that so much of Broad street as lies between Willow and Prime streets, shall not be subject to the operation of this act for the period of three years from the passage hereof.

The ordinance of July 5th 1867 is :—

Whereas, by ordinance of council approved July 5th 1866, the line of Broad street, from League Island to Fisher's Lane, was under Act of Assembly approved 23d of March 1866 appropriated as a public drive, and the mode of improving the carriage-way thereof was in detail specified.

And whereas, said act authorized the councils of the city of Philadelphia " to improve said street, or portions thereof, from time to time, and in whole or in part, with such roadway as may, in their judgment, be best adapted for its uses and purposes :" therefore :—

Sect. 1. The Select and Common Councils of the city of Philadelphia do ordain, that so much of said ordinance and the supplements thereto as direct that said roadway shall be laid with cobble stone, and a macadamized drive, in the middle of said street, be, and the same is hereby, repealed so far as relates to

[Hammett v. Philadelphia.]

that portion of said street as lies between Willow street and Columbia Avenue. And that between the points aforesaid, the carriage-way from curb to curb, shall be laid with the Nicolson pavement, in accordance with specifications, prepared by the chief engineer and surveyor, and to his satisfaction and approval. The cost of said paving, exclusive of the street intersections, shall be paid by the owners of property abutting upon said street, as directed in sect. 1 of Act of Assembly aforesaid; and that the contractors therefor shall accept in full payment for the paving of the intersections of the cross streets, such stone as may be removed from said street, and replaced by the Nicolson pavement aforesaid.

Sect. 2. The department of highways be and are hereby authorized and directed to enter into a contract with the patentee of the Nicolson pavement, or his licensees, for the performance of the work herein authorized, in accordance with this ordinance: provided the cost of said work, including the grading, material and workmanship, shall not exceed the sum of four dollars per square yard. And the contractor shall also enter into an obligation to the city to keep the street in good order for three years after the paving is finished.

On the 24th of October 1868, judgment was entered for the plaintiff, for want of a sufficient affidavit of defence, and damages were assessed at $4462.14. The defendant took a writ of error and assigned for error, that the court erred,

4. In not deciding that the ordinance and Act of Assembly were respectively null and void by reason of their being in violation of the constitution of the state, and of their being a delegation and exercise of a power to impose upon a few individuals a heavy expenditure, which should be borne by the public at large.

*C. Guillou* and *Porter*, for plaintiff in error.—The improvements contemplated by the Act of Assembly and the ordinance are not the usual public improvements, but special improvements. An act shifting the expense of making these improvements from the city to individuals is not legislation, but a decree: Sharpless v. Philadelphia, 9 Harris 168.

The principle which lies at the root of all the decisions that property-holders shall pay for paving before their lots, is that all owners shall do in front of their estates what is necessary to give the usual highway privileges to the public, the same privileges as have heretofore been given on other avenues, and as are to be expected hereafter in streets to be opened, not for general public improvements. This act and ordinance allows different kinds of improvements in different places. This act gives the councils power to discriminate as between different property-

[*Hammett v. Philadelphia.*]

holders. The legislature cannot delegate her power of legislation: Parker *v.* Commonwealth, 6 Barr 507. The Commonwealth cannot alienate her power of taxation: Mott *v.* Penna. Railroad Co., 6 Casey 1; Gault's Appeal, 9 Casey 100. Broad street is ordained to be "a public drive" for the enjoyment of the people in general and the duty of maintaining it is by this act and ordinance thrown on individuals. Broad street is already improved by paving within the limits of the plaintiff in error; the act applies to such parts as are not so improved. The paving has already been done at individual expense, any change is but repairing, which the city should do.

*W. McMichael* and *D. W. Sellers,* for defendant in error.— Acts imposing the cost of opening and paving highways, on owners of ground fronting thereon, are within the power of the legislature: McMasters *v.* Commonwealth, 3 Watts 292; Hancock Street, 6 Harris 26; Commonwealth *v.* Woods, 8 Wright 113. The mode and kind of paving is wholly for the judgment of the councils of the city, and if this is so, the exercise of that discretion is not the subject of judicial review. The principle is, that all questions not arising in the course of the common law, and the decisions of which have been committed to a special tribunal, are outside of the jurisdiction of the courts, unless the same be expressly conferred.

The opinion of the court was delivered, May 11th 1869, by

SHARSWOOD, J.—It may be considered as a point fully settled and at rest in this state, that the legislature have the constitutional right to confer upon municipal corporations the power of assessing the cost of local improvements upon the properties benefited. It is a species of taxation; not the taking of private property by virtue of eminent domain. It was decided in McMasters *v.* Commonwealth, 3 Watts 292, that in the opening of streets in a town or city, the damage occasioned to some of the lots might be apportioned and assessed upon others in the neighborhood improved in value thereby. It is there assumed, as a well-settled principle, employing the words of Chancellor Walworth in Livingston *v.* New York, 8 Wend. 85, that when any particular county, district or neighborhood is exclusively benefited by a public improvement, the inhabitants of that district may be taxed for the whole expense of the improvement and in proportion to the supposed benefit received by each. The conclusion seemed logically to follow; for, if a county, district or town can be assessed for a public improvement on the ground that they are particularly benefited, there can be no constitutional reason to exempt an individual from assessment on the same principle. It becomes a mere question of expediency, of which the legislature are the

competent and exclusive judges, and not of right. This doctrine is again asserted in Fenlon's Petition, 7 Barr 173; and in the subsequent case of the extension of Hancock street, 6 Harris 26, the constitutionality of such an exercise of the taxing power was declared to be no longer an open question.

On the same principle the validity of municipal claims assessing on the lots fronting upon streets their due share of the cost of grading, curbing, paving, building sewers and culverts, and laying water-pipes, in proportion to their respective fronts, has been repeatedly recognised, and the liens for such assessments enforced: Pennock v. Hoover, 5 Rawle 291; The Northern Liberties v. St. John's Church, 1 Harris 104; The City v. Wistar, 11 Casey 427; The Commonwealth v. Woods, 8 Wright 113; Magee v. The Commonwealth, 10 Id. 358; Wray v. The Mayor, &c., of Pittsburg, Id. 365.

These cases all fall strictly within the rule as originally enunciated—local taxation for local purposes—or, as it has been elsewhere expressed, taxation on the benefits conferred, and not beyond the extent of those benefits. There is, indeed, no clause in the Constitution of Pennsylvania which restricts the power of taxation in the legislature as is to be found in the constitutions of many of our sister states. Yet it must be confessed that there are necessary limits to it in the very nature of the subject. It is very clear that the taxing power cannot be used in violation of provisions in the Bill of Rights, everything in which is "excepted out of the general powers of government, and shall for ever remain inviolate." There is no case to be found in this state, nor, as I believe after a very thorough research, in any other—with limitations in the Constitution or without them—in which it has been held that the legislature, by virtue merely of its general powers, can levy, or authorize a municipality to levy, a local tax for general purposes. I shall have a word to say presently of two or three of our cases which are supposed to countenance such an idea. It may be shown logically, and that without difficulty, that such a doctrine lands us in this absurd proposition: That the whole expenses of government, general and local, may be laid upon the shoulders of one man, if one could be found able to bear such a burden. A conclusion so monstrous shows that the premises must be wrong. Such a measure would not be taxation, but confiscation. That can only be the consequence of attainder for crime, and not even then to its full extent, for there can be no forfeiture of estate to the Commonwealth except during the life of the offender. It is well remarked by Chief Justice Robertson, of Kentucky, under a constitution without restraint on the legislative power of taxation: "An exact equalization of the burden of taxation is unattainable and utopian. But, still, there are well-defined limits within which the

practical equality of the constitution may be preserved, and which, therefore, should be deemed impassable barriers to legislative power. * * The legislature, in the plenitude of its taxing power, cannot have constitutional authority to exact · from one citizen, or even one county, the entire revenue of the whole Commonwealth. Such an exaction, by whatever name the legislature might choose to call it, would not be a tax, but would undoubtedly be the taking of private property for public use, and which could not be done constitutionally without the consent of the owner or owners, and without retribution of the value in money :" Lexington *v.* McQuillan's Heirs, 9 Dana 513. "A legislative act," says Chief Justice Beasley, of New Jersey, "authorizing the building of a public bridge, and directing the expenses to be assessed on A., B. and C., such persons not being in any way peculiarly benefited by such structure, would not be an act of taxation, but a condemnation of so much of the money of the person designated to a public use :" The Tide-water Company *v.* Carter, 3 C. E. Green 518. "The whole of the public burden," says Chief Justice Black, "cannot be thrown on a single individual under pretence of taxing him, nor can one county be taxed to pay the debt of another, nor one portion of the state to pay the debts of the whole state. These things are not excepted from the powers of the legislature, because they did not pass to the Assembly by the general grant of legislative power. A prohibition was not necessary. An Act of Assembly commanding or authorizing them to be done, would not be a law, but an attempt to pronounce judicial sentence, order or decree : Sharpless *v.* The Mayor of Philadelphia, 9 Harris 168. It is said that the line of distinction between the right of taxation and the right of eminent domain is clear and well defined. Taxation exacts money or services from individuals, as and for their respective shares of contribution to any public burden. Private property, taken for public use by right of eminent domain, is taken not as the owner's share or contribution to a public burthen, but as so much beyond his share : The People *ex rel.* Griffin *v.* Brooklyn, 4 Comst. 419. It has been said by Judge Field, of California, now on the bench of the Supreme Court of the United States, that "money is not that species of property which the sovereign authority can authorize to be taken in the exercise of its right of eminent domain. That right can be exercised only with reference to other property than money, for the property taken is to be the subject of compensation in money itself; and the general doctrine of the authorities of the present day is, that the compensation must be made, or a fund provided for it in advance :" Burnett *v.* Sacramento, 12 California 76. I am not able, and do not feel disposed to enter the lists upon such a question, but it does seem to me that there may be occasions in which money may be taken by the state

[Hammett v. Philadelphia.]

in the exercise of its transcendental right of eminent domain. Such would be the case of a pressing and immediate necessity, as in the event of invasion by a public enemy, or some great calamity, as famine or pestilence, contributions could be levied on banks, corporations or individuals. The obligation of compensation is not immediate. It is required only that provision should be made for compensation in the future. Judge Ruggles confines the right to exact money by virtue of the eminent domain, to the case where it is for the use of the state at large in time. of war : The people *ex rel.* Griffin *v.* Brooklyn, 4 Comst. 419. I cannot see that there is any such necessary limitation. The public necessity which gives rise to it, prevents its being restrained by any limitations as to either subject or occasion. In truth it matters not whether an assessment upon an individual or a class of individuals for a general, and not a mere local purpose, be regarded as an act of confiscation—a judicial sentence or rescript, or a taking of private property for public use without compensation—in any aspect, it transcends the power of the legislature, and is void. I regard it as a forced contribution. If the sovereign breaks open the strong-box of an individual or corporation and takes out money, or, if not being paid on demand, he seizes and sells the lands or goods of the subject, it looks to me very much like a direct taking of private property for public use. It certainly cannot alter the case to call it taxation. Whenever a local assessment upon an individual is not grounded upon, and measured by, the extent of his particular benefit, it is, *pro tanto,* a taking of his private property for public use without any provision for compensation. That clause in the Declaration of Rights is, indeed, the sheet-anchor of private property, the security of which against the government, as well as all others, is intended in the first section of the ninth article : " All men have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." The dollar which a poor man has earned by the sweat of his brow—the fortune which a rich man has inherited from his ancestors—stand on the same rock, and are surrounded and protected by the same barrier. Invested for comfort and assurance against want in sickness or old age, or cherished as a provision for widow or orphan after he has gone, it is a right which it is despotism to take from him, except for the necessary purposes of government by equal and just taxation. It is none the less so if it be the act of the hydra-headed monster, a numerical majority, or that of a single autocrat. It is the solemn duty of the judiciary, under our constitution, to guard and protect this right of property, as well from indirect attacks under any specious pretext, as from open and palpable invasion. " There

[*Hammett v.* Philadelphia.]

being," says Chief Justice Marshall, of Kentucky, "no express constitutional declaration or prohibition directly applicable to the powers or subject of taxation, and none which, in terms, secure equality or uniformity in the distribution of public burthens, either general or local, there is no clause to which the citizen can, with certainty, appeal for protection against an oppressive and ruinous discrimination, under color of the taxing power, unless it be that which prohibits the taking of private property for public use without compensation. * * * This is the great conservative principle of the constitution, by which the rights of private property are to be preserved from violation under public authority; and we should feel bound to give it, as has heretofore been done, a liberal construction for the attainment of so important and valuable an object:" Cheany *v.* Houser, 9 B. Monroe 341.

It may be said that Sharpless *v.* The Mayor of Philadelphia, 9 Harris 147, and Kirby *v.* Shaw, 7 Harris 258, are irreconcilable with the reasoning employed in this opinion. As to the first of these cases it is now practically unimportant, because it has been in effect reversed by the seventh section of the first amendment of the Constitution of 1857. It has been seen that it recognises that there are limits to the taxing power such as are here contended for; and the only doubt can be whether the rule was rightly applied. As to Kirby *v.* Shaw, although a case on the very verge of the principle which is established—local taxation for local purposes—and there are some generalizations in the judgment as pronounced by Chief Justice Gibson by far too broad, yet ultimately it is put on the ground of peculiar benefit. "The advantages of a county town," says he, "are too well appreciated not to make every village use all its exertions to have a court-house provided for its benefit and convenience. Without a court-house to replace the burnt one, Towanda could not have remained the seat of justice; and as its inhabitants profited by, not only the disbursements of the tax among them, but a permanent increase of their business and an appreciation of their property, they were morally bound to contribution. It was for the legislature to fix the proportion, and we have neither a right nor a disposition to question their justice." Here, too, the only real question would seem to be as to the application of the principle. Kirby *v.* Shaw has been since followed by this court in the case of the South Street Bridge, The City of Philadelphia *v.* Field *et al.* (July 2d 1868), a judgment in which the Chief Justice and myself were unable to concur.

Assessments on property peculiarly benefited by local improvements, and in consideration of such benefit, are constitutional—thus far have the judicial decisions in this and other states gone, and no further. A few only of the leading cases need be cited. In the matter of Canal Street, 11 Wend. 155; Hill *v.* Higdon,

5 Ohio (N. S.) 243; Stryker v. Kelly, 7 Hill 9, 23; s. c., 2
Denio 323; Goddard Petitioner, 16 Pick. 504; Lowell v. Head-
ley, 8 Metcalf 180; Garrett v. City of St. Louis, 55 Missouri
505; Anderson v. Kern, Draining, 14 Indiana 199; Sanborn v.
Rice County, 9 Minn. 273; Weeks v. City of Milwaukee, 10
Wisc. 242; Creighton v. Mancon, 27 Cal. 613; Tide Water
Company v. Coster, 3 C. E. Green 54, 518. Undoubtedly, the
power of taxation is not to be rigidly scanned. Every presump-
tion is to be made in its favor. If the case is within the prin-
ciple, the proportion of contribution and other details are within
the discretion of the taxing power. We may say with Judge
Peck of Ohio: "It is quite true that the right to impose such
special taxes is based upon a presumed equivalent, but it by no
means follows that there must be in fact such full equivalent in
every instance, or that its absence will render the assessment
invalid. The rule of apportionment, whether by the front foot
or a percentage upon the assessed valuation, must be uniform,
affecting all the owners and all the property abutting on the
street alike:" Northern Indiana Railroad Co. v. Connelly, 10
Ohio (N. S.) 159. Or, as in our own case of Commonwealth v.
Woods, 8 Wright 113, where it was held, in an instance unques-
tionably within the general principle, that the assessment when
made in pursuance of law is final and conclusive, and cannot
again be reviewed by any other tribunal. On the examination
of the cases I have found two in which it was attempted, though
fortunately without success, to make the owners personally liable
for assessments beyond the value of their lots, cases which show
how dangerous and liable to abuse is this power of special taxation
with all the guards which can be thrown around it. In the matter
of Canal Street, 11 Wend. 155, the court say: " In this case it is
assumed and not contradicted that many individuals will be ruined
if compelled to pay the assessments, for which they are liable."
In Creighton v. Manson, 27 California 613, the lot in question,
before the grading of the street, for which the assessment was
claimed, was appraised for revenue purposes at $1400. It was
rendered worthless by the grading; yet the attempt was made to
make the owners personally liable for its assessment, which was
$1989.54.

It remains to apply these principles to the case presented to us
upon this record. The original paving of a street brings the
property bounding upon it into the market as building lots.
Before that, it is a road, not a street. It is therefore a local
improvement, with benefits almost exclusively peculiar to the
adjoining properties. Such a case is clearly within the principle
of assessing the cost on the lots lying upon it. Perhaps no fairer
rule can be adopted than the proportion of feet front, although
there must be some inequalities if the lots differ in situation and

[Hammett *v.* Philadelphia.]

depth. Appraising their market values, and fixing the proportion according to these, is a plan open to favoritism or corruption, and other objections. No system of taxation which the wit of man ever devised has been found perfectly equal. But when a street is once opened and paved, thus assimilated with the rest of the city and made a part of it, all the particular benefits to the locality derived from the improvements have been received and enjoyed. Repairing streets is as much a part of the ordinary duties of the municipality—for the general good—as cleaning, watching and lighting. It would lead to monstrous injustice and inequality should such general expenses be provided for by local assessments.

This case indeed is still clearer than that which I have put of a simple repairing. Broad street, in front of the lot of the plaintiff in error, was paved only a few years ago in the ordinary way in which all the other streets of the city have been paved—with cobble stones—and whatever advantage there was in his owning property on so wide and handsome a street was paid for by him in the increased cost assessed upon him for the paving. Without any pretence that it has been worn out and required to be replaced by another, it was torn up, and a new and very expensive wooden pavement substituted. The plaintiff in error did not remain silent. He protested and remonstrated, and filed a bill in equity to restrain the work before it began. The city and their contractors can plead no equity against him. It is said that it was all for his interest. But whether he was mistaken or not as to his own interest; he was the judge of that, not this court. The case is not to be decided upon any particular results in this instance, but on general principles which can work with safety and advantage to the public in all other cases. Mr. Hammett may have been specially benefited ; though we have no evidence of that on this record, and we have no right to consider evidence derived from any other source, but the next experiment may be unsuccessful and ruinous. It was well said by the court in The People *ex rel.* Post *v.* Brooklyn, 6 Barbour 209 : "If it be true that certain individuals are so greatly benefited, they will be quite as apt to discover where their interests lie as the Common Council; and if their lands are to be so much enhanced in value, they will, by their contributions, enable the authorities to perform the work at a very trifling expense to the city at large." The object of this improvement is not to bring or keep Broad street as all the other streets within the built-up portions of the city are kept, for the advantage and comfort of those who live upon it, and for ordinary business and travel, but to make a great public drive—a pleasure ground—along which elegant equipages may disport of an afternoon. We need look no further than the preamble of the act authorizing the improvement of Broad street, passed March 23d 1866 (Pamph. L. 299), for evidence that it is for the general

[Hammett v. Philadelphia.]

public good, not for mere peculiar local benefit. It states it to be " for the uses and purposes of the public, and the benefits and advantages which will enure to them by making and for ever maintaining Broad street, in the city of Philadelphia, for its entire length as the same is now opened, or may hereafter be opened, the principal avenue of the said city." Thus we have special taxation authorized, for an object, avowed on the face of the act to be general and not local, which relieves the case of all difficulty as to the fact. We have only to advance the project a few steps further to see how preposterous is the idea of paying for such an improvement by assessments. In the natural course of things, we may expect that it will be proposed to adorn this principal avenue with monuments, statuary and fountains. Will their cost be provided for in the same way? How much does this plan differ from a proposition to erect new public buildings on Independence Square, and assess the cost on the lots situated on the neighboring streets? On the same principle, lots on the public squares could be assessed to pay for any new project to beautify and adorn them, no matter how great the expense. It might be argued with equal plausibility that their value was increased by the improvement. We must say at some time to this tide of special taxation, thus far shalt thou go and no further. To our own decisions, as far as they have gone, we mean to adhere, but we are now asked to take a step much in advance of them. This we would not be justified by the principles of the constitution in doing.

Local assessments can only be constitutional when imposed to pay for local improvements, clearly conferring special benefits on the properties assessed, and to the extent of those benefits. They cannot be so imposed when the improvement is either expressed, or appears to be for general public benefit.

There have been several other points raised and discussed on this record, but we are not obliged to consider them, and as the conclusion at which we have arrived that the Act of Assembly of March 23d 1866, so far as it authorizes the Councils of the city of Philadelphia "to enact such ordinances or resolutions with such conditions or stipulations as may require the cost of said improvements to be paid for by the owners of property abutting on said street," is unconstitutional and void, disposes of the whole case, it is unnecessary to discuss any other.

Judgment reversed.

READ, J., delivered the following dissenting opinion:—

By a province law of 1700 commissioners or assessors were to be appointed by the governor, with four of his council, for regulating the streets and watercourses, the pitching, paving and gravelling thereof; the clearing of docks, and repairing landing-places and bridges in the towns (the watercourses under ground

[Hammett *v*. Philadelphia.]

to be arched and laid with brick or stone), and to defray the charge of pitching, paving, gravelling, and regulation of the said streets, and scouring and cleaning said docks each inhabitant concerned was to pay towards the same, in proportion to the number of feet of his lots or landings adjoining, on each or either side of the said streets or docks.

And for defraying the charge of repairing landing-places, bridges, making common sewers, and paving, pitching, gravelling and regulating any part of the streets; scouring and cleansing any part of the docks belonging to the public, each inhabitant in the said respective town or place, was to pay his proportional rate according to his estate in each town.

The commissioners were empowered to agree with and employ workmen for performing the same from time to time, and having made the assessments, were to appoint collectors and receivers thereof, and in case of non-payment, each collector by a warrant from the proper justice, was to levy the same by distress and sale of the delinquent's goods.

A similar law had been passed in 1698.

The lighting and watching of the city was vested in six wardens elected by the people by the Act of 9th March 1771 (1 Smith L. 350), and the paving and cleaning the streets, and the charge of the common sewers, were vested in six commissioners by the Act of 18th February 1769 (1 Smith L. 284). These acts were improvements on preceding acts of a similar character.

Both these acts invested the commissioners and wardens respectively with ample powers, with the aid of the city assessors, to lay and collect taxes, and jointly or severally to appoint clerks, collectors and treasurers.

The wardens had under their charge the lighting, watching and watering the streets.

The principal duties therefore of paving, pitching, cleaning, lighting, watching and watering the streets, were intrusted to two separate boards, entirely irresponsible to the city corporation, and who exercised powers copied almost literally from the acts of the English Parliament, in relation to the city of London, whose example was strictly followed by the Provincial legislature.

The city corporation, under the charter of 1701, had only such powers as the proprietary could confer, which were of a very limited character; and these ceased entirely with the Revolution, by which the corporation itself was dissolved.

Various temporary acts were passed, and in the year 1789 the municipal government of the city was parcelled out between the wardens of the city of Philadelphia and the commissioners for paving and cleaning the streets, who formed separate boards, and had entirely separate powers of taxing, and the city court, which was held by the justices of the peace of the city, who in

[Hammett v. Philadelphia.]

their individual capacities also had certain authorities in connection with one or other of the boards of local police.

By the charter of 1789 all the rights and estate of the old corporation were vested in the new, as also all the powers of the city wardens and the commissioners for paving and cleaning the streets of the city. But as some of the provisions of the existing laws were inconvenient, by the Act of 2d April 1790, the city legislature was invested with power to pass ordinances for lighting, watching, watering, pitching, paving and cleansing the streets, lanes and alleys; and assessing, raising and levying taxes upon the estates, real and personal, of the inhabitants of the city of Philadelphia, for these purposes, any law of the General Assembly of Pennsylvania, theretofore, made to the contrary in anywise notwithstanding.

The legislative power was vested in the select and common councils, who exercised all the authorities given to the corporation of the city, and under the word, watering, built the great waterworks finally located beyond its limits. They pitched and paved, lighted and watched the streets, constructed sewers, and finally covered over Dock creek, which had been specially attended to by the Acts of the 30th March and 1st September 1784. The title of the first act explained its purpose: "An act for continuing the arch over the public common sewer of the city of Philadelphia, through the middle of the dock, and covering the same with earth, from Walnut street to the foot-bridge."

There are other sewers in the city draining natural watercourses, such as the one running through Washington Square, which was an open stream when it was used as a Potter's Field.

In the old city, as laid out by William Penn, all the improvements were paid for by general taxation, and by loans effected on the credit of the corporation, forming the nucleus of the present city debt.

Instead of incorporating the suburbs into the city, or extending the city limits to include the built portions and population beyond them on the north, south and west, distinct corporations called districts, were created over specific portions of territory.

The districts of Southwark was incorporated on the 18th April 1794; of Northern Liberties, by Act of March 28th 1803; repealed by Act of March 16th 1819; of Spring Garden, by Act of 22d March 1813; of Kensington, by Act of 6th March 1820; of Penn, by the Act of 26th February 1844, and of the Township of Moyamensing, by the Act of 24th March 1812.

The greatest work undertaken by the old city, was the erection of the water-works, which were commenced within the city limits in 1799, and the water was raised by steam-engines at the Schuylkill and Centre Engine Houses. The works were removed to Fairmount, and were finished on the 7th September 1815, when

[Hammett *v.* Philadelphia.]

they were put into successful operation. These works were operated by steam power, and were finally stopped on the 25th October 1822, when the machinery propelled by water-power furnished by the Schuylkill, dammed at Fairmount, having been put in full and successful operation, was supplying the city with water.

The several incorporated districts entered into contracts with the city to supply them with water. Spring Garden on April 26th 1826; Southwark, June 1st 1826; Northern Liberties, June 6th 1826; Moyamensing, January 6th 1832; Kensington, October 6th 1833.

The districts being sparsely settled, with large vacant spaces, and inhabited by persons unable to bear heavy taxation, resorted to the old method of 1700, which applied to the whole province, of localizing the taxes, and imposing the cost of the improvements upon those who were immediately benefited by them. The district of the Northern Liberties comprised all that part of the township of that name, lying between the west side of Sixth street and the river Delaware, and between Vine street and Cohocksink creek; and by the Act of 1803, its commissioners were given full power to pave the footways and gutters within said district, to plant curbstones, and assess the freeholders in front of whose ground such footways shall be paved, in order to defray the expense of paving and keeping them in repair, in proportion to their respective extents of front; and upon the application of two-thirds of the freeholders on any street, lane or alley, to establish lamps, and a nightly watch in such street, lane or alley, the expense to be defrayed by an assessment agreeably to the county rates and levies within the district so lighted and watched, and upon like application, to pitch and pave any street, lane or alley, provided said street, lane or alley, so required to be paved, be not less in length than one, nor exceeding two squares, at any one time, and the owners of land in front of which such street is pitched and paved, shall be *taxed* in proportion to the respective fronts of their property within the streets so pitched and paved.

In the Act of 1813, incorporating the district of Spring Garden (which eventually comprised all the territory lying between the middle of Sixth street and the Schuylkill, and between Vine street and a line two hundred feet north of Poplar lane)—there are similar provisions in the 21st and 22d sections—a majority of the freeholders instead of two-thirds is required, but it is "Provided, that not more than two squares shall be included in any one application; and to tax the owners of the lots of ground bounding thereon, to defray the expenses thereof, in proportion to the extent of their respective fronts thereon."

By the Act of 9th March 1826, being a supplement to the Act of 1813, the commissioners, upon the application of the owners or a majority of them of real estate, in any square or two squares of

[Hammett v. Philadelphia.]

any street, lying contiguous to any street where the pipes may have been then laid, have full power to introdnce into such square or two squares of such street, Schuylkill or other wholesome water, for which the commissioners may hereafter contract; and all the real estate fronting on any such square or two squares of such street, and such other estate as may make use of the same, shall and may be taxed by the said commissioners for all the expenses that may be incurred for, or in laying the said pipes, introducing the water into such square or two squares, and keeping up the necessary supply of water in proportion to the said respective fronts of the said real estate, which taxes and the expenses of collection shall be a lien on the same real estates respectively, and shall be paid in preference to any other subsequent lien on the same.

By the Act of 4th April 1837 (P. L., 300), the commissioners of Spring Garden are authorized, on the petition, in writing, of a majority of the owners of the real estate fronting on any square or two squares of any street in said district, to cause sewers to be laid in any such street, lane or alley, for the purpose of draining the lots fronting them, and the expenses thereof, or so much thereof as would be necessary to construct a culvert not exceeding in diameter three feet in the clear, together with the interest and expenses of collecting the same, to be paid as is provided by the laws and ordinances relating to the introduction of the Schuylkill water into the said district; provided, that no culvert, as aforesaid, shall empty into or any way interfere with Fairmount dam, but shall empty below the said dam, should they empty into the river Schuylkill.

A similar act relating to sewers in the Kensington district was passed on the 13th of April 1844 (P. L. 308). In these acts, culvert and sewer are used as synonymous.

Acts of a similar character as to the paving and laying of water-pipes, are to be found in all the said districts, and in several as to sewers and culverts. By the Act of 3d of February 1824 (P. L. 18), "relating to taxes on certain real estate in the city and county of Philadelphia;" in the 8th section, it is enacted, "That all and singular the provisions of this act shall be deemed and taken to apply to taxes, rates and levies, imposed or assessed by the authority of the city of Philadelphia, or of any corporation in the city and county of Philadelphia, upon real estate, situate in the said city or county, except water-rents, which may be imposed for the use of the Schuylkill water, which shall not be considered as coming within the provisions of this act."

The exception as to water-rents was owing to the fact, that they then existed in the city only, where the collection was enforced by the summary proceeding of cutting off the supply of water. When the contracts were made with the districts outside the city, the

15 P. F. SMITH—11

[Hammett *v.* Philadelphia.]

collection of water-rents by those corporations was enforced in a similar manner.

By the ninth section of the Act of the 16th April 1840 (P. L. 412), it was made lawful for the commissioners and inhabitants of the incorporated districts and townships, within the county of Philadelphia, to file of record in the proper prothonotary's office all claims and demands due to the said commissioners and inhabitants of any of the said incorporated districts or townships, "For pitching and paving streets and alleys, for digging down, filling up, and for curbing, paving and repairing any footway within the same; and also for building culverts, and laying down iron pipes within the same."

By the next section the mode of filing the claim is prescribed, and a remedy by scire facias is given. By the second section of the Act 16th of April 1845 (P. L. 488), a limitation is fixed for these liens and those of the Board of Health; and by the first section of the Act of 19th April 1843 (P. L. 342), and the fourth section of the Act of 11th March 1846 (P. L. 115), these claims may be read in evidence of the facts therein set forth, and the defences to be made are greatly restricted if not almost extinguished.

I have thus traced up these localized taxes in the incorporated districts of the county of Philadelphia from the year 1803, and their propriety, sound policy, and constitutionality have never been doubted, whilst they have built up a magnificent city entirely outside of and surounding the old city, of two square miles, laid out by William Penn.

By the Act of 2d February 1854, the corporate name of the Mayor, Aldermen, and Citizens of Philadelphia, was changed to "The City of Philadelphia," and the boundaries of the city extended so as to embrace the whole of the territory of the county of Philadelphia, and all the powers of the said corporation, as enlarged and modified by the act, are to be exercised and have effect within the said county, and over the inhabitants thereof.

By the 44th section it was enacted: "That all acts of the legislature, not inconsistent with this act now in force, shall continue in operation within the limits of the county, city, district, borough or township, in which they are now operative, under the authority of the city councils, courts, and officers, created by this act, or permitted to continue as consistent therewith, until such acts shall be altered or repealed by the legislature; provided, that the city councils shall have power by ordinances to extend the operation of laws now in force, within the city, police, or municipal districts, to other parts, or over the whole of the enlarged limits, and to declare what laws have become obsolete by this act, or the extension as aforesaid, of other laws. All ordinances of the present city of Philadelphia, and other municipalities

[Hammett *v*. Philadelphia.]

within the county of Philadelphia, shall continue in force within the limits of said city and municipalities respectively, until repealed by said councils, and no longer; and said councils, in enacting new ordinances, may make distinctions between the built and rural portions of the new city, as they may deem required by circumstances." By the 40th section, "It may be prescribed by ordinances, that paving of streets, except at the intersection thereof, and of footways, and laying of water-pipes, within the limits of the city, shall be done at the expense of the owners of the ground, in front whereof such work shall be done, and liens may be filed by the said city for the same as now practised and allowed by law."

The 8th section of the Act of 21st April 1855, provides that "The charges for culverts and pipes shall be at not exceeding the following rates per lineal foot, according to the fronts of the owners, to wit: For water-pipes seventy-five cents, making the usual allowance for corner lots; for culverts seventy-five cents, and for street paving one dollar per square yard, and all extra and further charge, and for intersections, shall be paid out of the general taxation."

By the first section of the Act of the 8th April 1864 (P. L. 324), the city of Philadelpia shall have power to construct sewers in the streets of the said city, and to charge therefor the sum of seventy-five cents for each lineal foot against each front, the same to be recovered as liens for the laying of water-pipe are now recovered in said city, and with the same allowance for corner lots.

By a further supplement to the act incorporating the city of Philadelphia, passed the 30th March 1866 (P. L. 354), it is provided that so much of the eighth section above mentioned as limits the charges for the laying of culverts and water-pipes to the rate of seventy-five cents per lineal foot, and for street paving to one dollar per square yard, and so much of the first section above stated as limits the charge for the construction of sewers to the sum of seventy-five cents for each lineal foot, against the front of each property, and all other acts, or parts of acts, which limit the charges for such purposes, so far only as such limitations are concerned, are repealed, and thereafter all the said charges and rates shall be fixed from time to time by ordinance of councils.

The lapse of eleven years, the change in the currency, and the largely increased price of labor and materials, with the necessary introduction of improved pavements, whether of wood, or iron, or stone blocks, in place of the miserable cobble-stones which disgrace our city, made the repeal of the former limitations indispensable, and the power of fixing the necessary limits was properly vested in councils, to be exercised by them in their legislative capacity, by ordinance, requiring the official sanction of the mayor.

[*Hammett v.* Philadelphia.]

These charges, by whatever name called, are simply taxes laid by virtue of the taxing power vested in the legislature, and by them delegated to the various municipalities in the county of Philadelphia. They are taxes, and are so called and treated by Judge Kennedy in Pennock *v.* Hoover, 5 Rawle 291, on the 16th April 1835. The assessment was for paving done in front of a part of the property sold. Speaking of the provisions of the Act of 2d February 1824, the learned judge says, p. 317 : "Now the commissioners of the Kensington district of the Northern Liberties, being a *corporation within* the *county of Philadelphia*, and the tax for paving having been *lawfully* assessed by them, it seems to me that it falls directly within the provisions of this act, and is thereby made a lien upon a part of the property sold in this case, and must be paid before any other debts to which it was liable." In Pennell's Appeal, 2 Barr 216, ten years afterwards, the same learned judge, speaking of a claim for laying iron pipes in the district of Spring Garden, being a lien, says : " This may be so, but the Act of the 9th of March 1826 seems to be sufficient to embrace it if considered as a tax assessed for furnishing and laying down the pipes in front of the property, which we think is the proper light in which it ought to be viewed. Taking this view of it, it became a lien under the Act of 1826, upon the property sold by the accountants."

In The Northern Liberties *v.* Swain, 1 Harris 113, which was the case of a municipal claim for laying water-pipes, and Thomas *v.* Northern Liberties, Id. 117, which was a municipal claim for paving and curbing in front of a lot of ground, and Perry *v.* Brinton, Id. 202, Justice Bell distinctly recognises the validity of all the acts creating the charges and assessments on the front foot, those making them liens on the specific property, and those providing a special mode for their recovery and payment.

At the same term two cases were decided in which the opinions were delivered by Judge Coulter. They were Pray *v.* The Northern Liberties, reported 7 Casey 69, which was a municipal claim for paving and curbing; and The Northern Liberties *v.* St. John's Church, 1 Harris 104, which was a claim for the laying of pipes for the conduit of the Schuylkill water in front of the defendant's property, a church, in which all these acts are recognised as constitutional. In the first case it was objected that the charge or assessment had not been registered, and in the second that it was a tax, and that therefore they were exempt from it. Judge Coulter, to avoid the argument, distinguishes between taxes for public purposes and the public good; and " the assessment or charge" which " is an equivalent from the owner for the improvement made to the value of the property. Such assessments are not collected like public taxes, but generally, as in this instance, a particular mode of recovering the charge is pointed out. It is

[Hammett v. Philadelphia.]

evident from the face of all the Acts of Assembly in relation to this incorporated district, that the legislature had in view the difference between taxes properly so denominated, and charges or assessments for the improvement of particular streets as the advance of population required such improvement."

"Nothing is more reasonable and fair than that the owners of property should be compelled, with their fellow-corporators, to pay for improvements in the streets, paving, &c., which is for the benefit of all, and not lie by and evade the payment of assessments for that purpose and yet enjoy the full benefit of the improvements."

In coming to this conclusion Judge Coulter leaned on several New York cases, which, if they bear that construction, have all been overruled by the unanimous decision of the Court of Appeals in The People v. The Mayor, &c., of Brooklyn, 4 Comstock 419, in April 1851. The opinion was delivered by Judge Ruggles, and is a most exhaustive discussion of the whole subject. Such street assessments are taxes, and are an exercise of the power of taxation vested in the state government. The power to tax implies a power to apportion the tax as the legislature shall see fit, and the power of apportionment has no limit where there is no constitutional restraint. This is the settled law of New York, and has never since been questioned. The delegation of the power of taxation to municipal corporations by the state, is declared, by all the authorities in Pennsylvania and New York, to be a constitutional exercise of power by the legislative authority.

In Gault's Appeal, 9 Casey 94, the late Chief Justice Woodward says, p. 100: " But, conceding that here was a contract and an interest within the meaning of the constitution (both which might perhaps be well doubted), it is to be observed that all these Acts of Assembly authorizing the assessment of municipal taxes, the creation of liens therefor, the sale of lands to satisfy the liens, and the time of redemption given to the owners, constitute together a system of remedies for enforcing the taxing power, than which there is no clearer power in the constitution. States and cities cannot exist without taxation. The time, the mode, and the measure of taxation are committed altogether and exclusively to the legislative discretion. As I have aleady intimated, it is on this ground alone, that the constitutionality of these laws is to be sustained, which without notice to the owner, or judicial sentence against him, seize his title to real estate, and sell it to the highest bidder for the payment of taxes. On the same ground, the absoluteness of the legislative power to regulate taxation, this Act of 13th May 1856 can be abundantly supported. It is part and parcel of the regulation of public taxation, which under the constitution belongs exclusively to the legislature."

The same doctrine as to the taxing power was held by this

[Hammett *v.* Philadelphia.]

court in the City of Philadelphia *v.* Tryon, 11 Casey 401, in the case of a culvert or sewer of the diameter of five feet, laid wholly in what was formerly the district of Spring Garden and constructed under the ordinances of the city of Philadelphia. The court held that the city could enter liens against lots through or along which the culvert ran for the cost of construction or part of it, by virtue of the power of special taxation vested in the corporation. The culvert, in fact, was built by two modes of taxation. First, by the tax of seventy-five cents per lineal foot according to the fronts of the owners; and second, all extra or further charge, and for intersections, was paid out of the general taxation. In Spring Garden *v.* Wistar, 6 Harris 195, it was held that the commissioners of that district were authorized to cause Broad street from Callowhill street to Ridge road to be paved, the expense thereof to be assessed on the owners of lots bounding thereon in proportion to their respective fronts, without any application for such improvements having been made by a majority of the owners of lots on said street.

In The City of Philadelphia *v.* Greble, 2 Wright 339, it was decided that the city has no legislative authority to enter liens for culverting done within the limits of the *old* city. But in Lipps *v.* The City of Philadelphia, Id. 503, following The City *v.* Tryon, it was held that lot owners fronting the culvert of Cohocksink creek, are subjected to the customary assessments for its construction.

But this whole question was discussed and decided in The Commonwealth for use, &c., *v.* Woods, 8 Wright 113, and its origin and efficacy distinctly traced from the general legislative power of taxation. The same doctrine is maintained by the late Chief Justice in the next case of McGonigle *v.* The City of Allegheny, Id. 118: "All these municipal taxes for improvement of streets rest for their final reason upon the enhancement of private properties; Schenley's Case, 12 Casey 57." "A similar attempt to impose municipal taxes upon public ground was made without success in Howell *v.* City of Philadelphia, 2 Wright 474."

The same principles govern the cases of Magee *v.* Commonwealth, 10 Wright 358, and Wray *v.* Mayor, &c., of Pittsburg, Id. 365; Coxe *v.* City of Philadelphia, 11 Wright 9, and City of Philadelphia *v.* Burgin, 14 Id. 539; Borough of Greensburg *v.* Young, 3 P. F. Smith 280; and see Smedley *v.* Erwin, 1 Id. 445.

The cases of the District of the City of Pittsburg, 2 W. & S. 320, McMasters *v.* Commonwealth, 3 Watts 292, Pittsburg *v.* Scott, 1 Barr 309, Extension of Hancock Street, 6 Harris 26, were all correctly decided. Where the land was taken for a street, it was by virtue of the right of eminent domain, and the compensation was provided by the exercise of the power of local

taxation.  The result was obtained through two great powers possessed by the state, the right of eminent domain and the power of taxation.

In the county of Philadelphia, land was taken for streets and highways by the right of eminent domain, and the damages assessed, or compensation was paid out of the county funds raised by general taxation.  The paving, laying of water-pipes, and construction of culverts and sewers in the districts outside of the old ·city, were all done at the expense of the owners in front of whose lots they were laid, and they were taxed for the cost thereof, per lineal foot, according to the fronts of the owners.

The cases of Green v. Borough of Reading, 9 Watts 382, in 1840; of The Mayor v. Randolph, 4 W. & S. 514, in 1842; and O'Connor v. Pittsburg, 6 Harris 187, in 1851, show the vast powers vested in municipal corporations over their public streets by the state.  " Highways, therefore, being universally the property of the state, are subject to its absolute direction and control."  Philadelphia & Trenton Railroad Company, 6 Whart. 44.

Broad street now extends from the Delaware, at League Island, to the northern boundary of the present city, in one straight line, of a uniform width of one hundred and thirteen feet, for eleven and a half miles.

The history of the measures which led to the Act of 23d March 1866, contained in my opinion in the injunction case, and of those which grew out of it, and led to the Nicolson pavement being laid on Broad street, south of Columbia Avenue, is so fully explained in it, that I would simply refer to it as printed in the paper-book of the defendants in error, at pages 37–38 to page 48 inclusive.

The Act of 1866 is " Supplementary to an Act to Incorporate the City of Philadelphia, *authorizing* the *improvement* of *Broad street in the said city;*" that is, of a magnificent avenue, one hundred and thirteen feet wide, and eleven and a half miles long, entirely unparalleled in Europe or America.

The preamble expresses its purpose and policy :—

" Whereas, for the uses and purposes of the public, and the benefits and advantages which will enure to them, by making and for ever maintaining Broad street, in the city of Philadelphia, for its entire length, as the same is now opened, or may hereafter be opened, the principal avenue of the said city, and for keeping and preserving the said street for ever *free from and unobstructed by railroad tracks extending along the same*, as well as for the purpose  of enabling and authorizing the said city to *remove or cause to be removed*, all *railroad* and *railway tracks*, and other obstructions laid or constructed along the same, and in improving its uses for public services as aforesaid."

The first section gives the city very large powers over this street.

It is authorized and *required* to occupy and appropriate Broad street, in the city of Philadelphia, for its length, as the same is now opened, or may hereafter be opened, *and from curb to curb* thereof, except as hereinafter provided, "for the uses, purposes of a *public drive, carriage-way,* street or avenue, *and to improve* the said street, or portions thereof, from time to time, and in whole or in part *with such mode of pavement,* paving, macadamizing, gravelling or other roadway, *as may in the judgment of the Select and Common Councils of said city, be best adapted to, and for the uses and purposes aforesaid;* and, for that purpose, the said councils shall have, and are hereby authorized to enact such ordinances or resolutions, with such conditions or stipulations, as may require the cost of said improvements to be paid for by the owners of property abutting upon said street. Provided, that so much of Broad street as lies between Willow and Prime streets, shall not be subject to the operation of this act for the period of three years from the passage hereof."

The word improve, was the operative word in the Reading and Pittsburg charters, under which streets were filled up, and houses partially buried, or dug down seventeen feet below the former grade, and the foundations of a cathedral church laid bare, and the whole edifice endangered. The power thus conferred on the city covers all that has been done by the municipal authorities under this act.

The second section provides for the removal of the railroad tracks, the compensation to be paid out of money to be voluntarily subscribed by the citizens for that purpose. The city has taken up part, and will take up the whole of the Broad street Railroad, from Vine to South streets, leaving comparatively valueless railroad tracks from Willow to Vine street, and from South to Prime street.

The third section provides specially for the Philadelphia and Reading Railroad Company. The proviso in the fourth section is repealed by the Act of 31st March 1868 (P. L. 535); and the fourth section therefore enacts:

"*That upon the improvement of said street, or any portion thereof, as provided in the first section hereof, and in consideration of the payment of the cost thereof, by the owners of property abutting thereupon as aforesaid;* or upon and in consideration of the contributions and payments of the moneys agreed to be paid, or ascertained by a jury as aforesaid, no person or persons, or corporations of any kind, nor the city of Philadelphia, shall at any time hereafter be authorized or empowered to locate, lay, construct or maintain any railroad, or railway tracks, or other obstructions prejudicial to the uses and purposes aforesaid, along or upon said street, or any portion thereof (except at the inter-

[Hammett *v*. Philadelphia.]

section of streets, and for the purpose of crossing said Broad street)."

Upon the payment of the assessments for the Nicolson pavement, by the owners of property abutting thereon, this contract is perfected, and the street is for ever delivered from all railway tracks, a consideration which has entered very largely into the greatly increased value of property in Broad street. The whole cost of this pavement, to the owners on both sides of the street, is $91,354.60; for which they have a model carriage-way, smooth and noiseless, a blessing to horses, a saving to all vehicles, and a comfort to the aged and the sick, besides the ·permanent deliverance of Broad street, in its whole length, from all railroads for ever.

By the fifth section, "The Select and Common Councils of the city are hereby authorized and required to enact all ordinances or resolutions necessary and proper for carrying into effect the requirements, provisions and purposes of this act; and, in like manner, to require any railway tracks hereafter to be laid and constructed upon Broad street, to be done under the direction of the chief engineer of the said city, in such manner as shall not interfere with any carriage, or roadway, or boulevard which may occupy the centre portion of said street; and all acts, or parts of acts, inconsistent with the terms and provisions of this act, be, and the same are hereby repealed."

It is, perhaps, difficult to conceive of an act conferring so much beneficial power, upon a municipal corporation, over its greatest street, and yet in a strictly constitutional form, which has been sanctioned by a uniform practice of sixty-five years.

The law, therefore, is constitutional.

The case does not come before us on all its merits, as it would upon the bill in equity, filed by Mr. Bouvier and others, and now pending in the Nisi Prius, but upon a technical affidavit of defence, out of which the constitutional objection must be struck as entirely untenable.

After this full examination of the Act of 1866, it cannot be contended that the city had not the power to direct what kind of pavements should be laid down in the whole or any part of Broad street, whether paved with cobble-stones, or in any other way. It was the very purpose of the act to do this, for no man in his senses could suppose that only where the streets were not paved at all, the Nicolson, or any other expensive pavement, should be laid, whilst the most magnificent portion of it, from Coates street to Columbia Avenue, should be condemned to an old cobble-stone pavement, which would entirely prevent Broad street from being a public drive, frequented by citizens from all parts of the metropolis.

Neither the cobble-stones, nor the gravel of the public streets, the highways of the city, whether paid for by *general* or *local*

[Hammett *v.* Philadelphia.]

*taxation*, belong to the persons fronting on the streets, but to the corporation. The cobble-stones in Broad street have laid the Nicolson pavement of the street intersections, amounting to 3963.13 square yards.

In the argument in the injunction case, the cobble-stones figured as the obstructions mentioned in the Act of Assembly, and now it is complained that they are taken to pay for the intersections, when by the terms of the law, the city might have required the owners of property to have paid the cost, intersections and all.

It is the first time that any owner of property has claimed the soil dug out or filled up to bring the street to grade, the gravel laid for a foundation, and the stones or pavement laid upon it. In improving a street in a city, by this theory, the state, or its representative, the municipality, must take the dirt, the gravel, and the stones, of the cartway of the public highway, by the right of eminent domain; which "highways," says C. J. Gibson, "therefore being universally the property of the state, are subject to its absolute direction and control."

The averment that the contract was not considered by the department of highways, cannot be inquired into by the defendant, as fully appears by the city's answer, p. 51, and by the authoritative decisions of this court, City, to use, *v.* Wistar, 11 Casey 427; Wistar *v.* Philadelphia, 3 Grant 311; Schenley *v.* Com., to use, &c.; City of Allegheny, 12 Casey 29; City *v.* Burgin, 14 Wright 539; City *v.* Burns; and Marshall *v.* Commonwealth, to use of City of Allegheny, decided in January last. The objection that the city solicitor does not appear to have approved of the contract is frivolous, and so in reality is the attempt to apply the Act of 1856, which relates only to yearly supplies. In a note to the digest of laws, relating to the city of Philadelphia, prepared under the supervision of the law department of the city, speaking of this act, it is said: " This section applies only to the *annual* supplies required in any department of the city. Any extraordinary work required by any department, or any constructions which are directly authorized by the city, are unaffected by this act."

The price was fixed by councils, as they alone could contract with the patentee, and the experiment made previously, in Broad street between Oxford and Jefferson streets, showed that the sum of $4 per square yard only gave a fair living profit: City *v.* Sellers, 24 Legal Intelligencer 261, per Sharswood, P. J.

The ordinance of the 5th July 1866, was objected to by the owners of property on this part of Broad street, and meetings were held of the citizens, out of which grew the proposition to ·adopt the Nicolson pavement; the ordinance of councils, the contract with the patentees or licensees, and the laying a pavement which is admired and approved by all our citizens.

The carriageway in Broad street, between Willow and Poplar streets, is 77 feet wide; and from Poplar to Columbia Avenue, 57 feet wide. The distance from Columbia Avenue to Coates street is 4256 feet 5½ inches.

Mr. Hammett's property is 240 feet on Broad street, by 160 feet on Poplar street to Carlisle street. It is in what was formerly the District of Spring Garden. It was purchased by him, on the 3d of November 1865, for $57,000, and he has added to the dwelling what has cost probably $20,000 or $25,000. It was assessed in 1866 at $36,000, and in 1869 at $90,000. The ground alone (all buildings off) would now bring $100,000, at the very least, and the whole property is worth $150,000. All property on this portion of Broad street has increased in a similar ratio— owing to the provisions of the Act of 1866 and the Nicolson pavement.

The rise on this street has been from $8 to $14 to $20 to $35, and sells at those figures; that is, from $133.33 to $233.33, to $333.33 to $583.33 per front foot. Such has been the effect of the Act of 1866, the ordinance and contract of 1867, and the laying of the Nicolson pavement. The titles of the vacant lots on Broad street are indisputable, and they remain unimproved, because the owners, like the dog in the manger, will neither build themselves nor sell to others, who in six months would cover them with beautiful dwellings.

It is the interest of Mr. Hammett to pay this judgment.

Having traced in the former part of this opinion the history of the paving, sewerage, and watering of our city and suburbs, now forming one consolidated city, from 1700 to the present time, a period of nearly one hundred and seventy years, it is proper to see how far the legislation now objected to, was copied from our English ancestors. By a statute of 2 William and Mary, § 2, ch. 8 (passed 1690), it was enacted, "That all open streets, lanes and alleys which now are paved within any of the parishes or places aforesaid, shall be from time to time repaired, amended and paved at the costs and charges of the householders inhabitants in any such streets and lanes respectively; and where any houses shall be empty and unoccupied in any such streets and lanes to be paved and repaired at the charge of the owners or proprietors thereof, in manner following (that is to say): Every of the said householders, owners or proprietors of houses, to repair, pave and keep repaired, amended and paved, the streets, lanes or alleys before his house, stables or out-houses, so far as his housing-walls or buildings extend, unto the Denter-stone channel, or middle of the same street, lane, or alley; upon pain to forfeit twenty shillings for every perch or rod, and after that rate for a greater or less quantity for every default of twenty shillings a week, for

[Hammett *v.* Philadelphia.]

every week after, until the same shall be sufficiently paved and amended."

The same regulation is applied to new streets ordered to be paved by the justices at their session, but the penalties are increased to forty shillings.

The same policy is pursued at the present day, except that the paving is done, and the sewers are built by the vestry or district board, and the expenses are apportioned among the owners of property bounding or abutting on the street where the paving or sewers are laid or constructed. In the matter of paving, the expenses thus charged include "the cost of paving at the points of intersection of streets, and all other incidental costs and charges;" and in the case of sewers, "the expense of constructing such sewer, and the works appertaining thereto, including the cost of gullies, side entrances, lengths of sewer at the intersection of streets, and other incidental charges and expenses, shall be borne and defrayed" by the abutters on such streets : Act of 25 and 26 Vict., ch. 102, passed 7th August 1862, §§ 52 and 77 ; 3 Chitty's Coll. Statutes, pp. 414, 420.

The footway is as much a part of the street as the cartway, the one being appropriated to human beings, the other to animals and vehicles. By the Act of 18th February 1769 (1 Hall and Sellers 358, 361), the owner was obliged to pave, amend and repair the foot-pavement in front of his lot or house, at his own expense, under a penalty for every foot fronting his possession so neglected to be paved. By the Act of 3d April 1851, regulating boroughs, the corporate officers have power "to direct the grading, curbing, paving and guttering of the side or footwalks, by the owner or owners of the lots of ground fronting thereon, in accordance with the general regulations prescribed ;" and on failure of owners to do so, the same is done by the borough authorities, who collect the cost of the work and materials, with twenty per centum advance thereon from said owners, as claims are by law recoverable under the provisions of the law relative to mechanics' liens.

By a further supplement to an act to incorporate the city of Erie, passed 2d April 1868, Pamph. L. 610, the mayor and councils have the power, upon petition of twelve freeholders, to lay out and open new streets in said city, by ordinance, and by the fourth section, "Whenever the construction of a sewer or the pavement of the carriage-way of a street or part of a street *shall have been*, or hereafter shall be ordained at the expense or in part at the expense of owners of real estate fronting on such street or part of a street, the *tax therefor assessed* against such owners shall be a lien on their respective portions of real estate fronting on the street or part of a street so improved, and shall have priority over all other liens," which, if not paid, may be filed in the pro-

thonotary's office, with ten per cent. added to the assessment, to be recovered in the same manner as mechanics'liens. The collector is to demand payment of the tax at least thirty days before filing the lien. By section seventh, "In assessing special taxes for the construction of sewers, it shall be lawful to extend the taxation on the land fronting on the street in which the sewer shall be constructed, to the distance of twenty feet beyond the upper extremity of such sewer, so that said twenty feet be made to pay its proportion by the lineal feet of the cost of the construction of such sewer." There are similar provisions as to the paving or repaving of the side-walks.

Provisions of a similar character are to be found in the supplement to the charter of the city of Allentown, passed 4th April 1868, Pamph. L. 682; and also as to grading and paving, in an act to confer additional power upon the burgess and town council of the borough of Pittston, passed 13th April 1848, Pamph. L. 928; and also as to paving by assessment, by the front foot, in the 6th section of the further supplement to the act incorporating the borough of South Erie, passed 6th March 1867, Pamph. L. 356; so provisions similar to those in the city of Erie, in relation to paving in the borough of McKeesport, in the county of Allegheny, are enacted by the Act of 3d April 1867, Pamph L. 732. There are similar provisions as to the borough of Wilkesbarre, Act 5th April 1867, Pamph. L. 841. The addition to the cost is twenty per cent.

The strongest example of the legislature approving and adopting the policy of localized taxation by the front foot in paving roadway, curbing, paving and repairing sidewalks, and constructing drains and sewers, is to be found in the supplement to an act to incorporate the city of Chester, in the county of Delaware, passed 22d March 1869.

I have given enough of the many legislative acts on these subjects to show the settled policy of the state, the constitutionality of which has never been questioned by this court, although formerly wrong reasons may have been assigned for it.

The power of the legislature in the state of Pennsylvania over highways, whether roads or streets, as settled by judicial authority, is supreme. The language of Chief Justice Gibson, nearly thirty years ago, has been fully sustained by legislative action and judicial decision. "What is the dominion of the public over such a street? In England a highway is the property of the king, as *parens patriæ*, or universal trustee. In Pennsylvania, it is the property of the people, not of a particular district, but of the whole state; who constituting as they do, the legitimate sovereign, may dispose of it by their representatives, and at their pleasure." "The right of passage by land or by water is a franchise which she holds in trust for all her citizens, but over which she holds

despotic sway; the remedy for the abuse of it being a change of rulers, and a consequent change of the law. No person, natural or corporate, has an exclusive interest in the trust unless she has granted it to him. Her right extends even to the soil, being an equivalent for the six per cent. thrown into every public grant as compensation for what may be reclaimed for roads, and she has acted on the basis of it." "An adverse right of soil could not impair the public right of way over it, or prevent the legislature from modifying, abridging or enlarging its use, whether the title were in the corporation or a stranger:" 6 Wharton 44, 45.

This large power has been delegated by the state to the city of Philadelphia, in a sufficiently extensive form to cover all the exigencies of the case before us. The words of the statutes are large enough, and the authority conferred is strictly within the constitutional limits of the legislative power.

But it is objected, it was unconstitutional to take the cobblestones, being *obstructions* to the free passage of the street. I shall not repeat what I have already said, but in the language of this court I answer: "It is said, however, the city councils are not owners of the streets, and that only such artificial roads are intended as have owners. It is true the councils are only in a subordinate sense owners of the streets of the city, yet the city does own the paving-stones which make the streets. The councils are the legal custodian, having power to alter grades, *and to change the kind of pavements at pleasure ;* and it is their duty to hold the streets for the public in good order at all times. It is therefore no stretch of language to speak of the city as a party owning the streets. As already remarked, it has often been recognised by the legislature as having a right in the streets, so far as to make the consent of councils a prerequisite to their appropriation to the uses of individuals and private corporations. This is conceding to the city the rights of ownership. Besides, in common understanding, the streets belong to the city. They are thus spoken of:" Com. *v.* Central Passenger Railway, 2 P. F. Smith 517. The graded and paved streets in the city were held to be artificial roads.

" These streets for many years having been used for the construction of sewers, and for the laying of water and gas pipes, and no one has ever seriously questioned the right of the city to authorize their use for such purposes. " " And whether the corporation be the owner of the fee of the streets in trust for the public, or whether it be merely the trustee of the streets and highways, as such, irrespective of any title to the soil, it has the power to authorize their appropriation to all such uses as are conducive to the public good, and do not interfere with their complete and unrestricted use as highways; and in doing so it is not obliged to confine itself to such uses as have already been permitted.

[Hammett v. Philadelphia.]

As civilization advances, new uses may be found expedient. It was upon this principle that the existing railways in this city (New York) and in Albany, and the tunnels in the city of Brooklyn, and in the village of Whitehall, have been sanctioned:" Angell on Highways, ed. 1868, p. 383, 4.

In the districts, outside of the old city proper, there were three great items of street expenditure—paving, sewers, and water-pipes —which were paid for by the owners of property fronting on the street, per lineal foot, according to the fronts of the owners.

The paved streets outside the old city are estimated at 300 miles of a 26 feet cartway, which would give 4,576,000 square yards, which at $1 per square yard, the price fixed in the Act of 1855, would cost $4,576,000, paid by localized taxation, and not by general taxation, or by forming a large item of our present debt.

The water-pipes laid in the same outside districts to 1868, were 1,675,208 feet, which at $1 per lineal front foot on each side of the street, would make the cost $3,350,416. In Southwark and Moyamensing it was $80.01 on each side of the street, or $1.60 per foot, up to 1854; but in all the other districts $1 per lineal foot on each side, or $2 per foot. I have therefore taken the $2 as the price paid by localized taxation for each lineal foot of iron pipe. I am indebted to Mr. F. Graeff, Chief Engineer of the Water Works, for this information.

Upon the subject of sewers, the chief engineer and surveyor, Mr. Kneass, can only furnish statements of cost since 1855. In the three years, 1859, 1860, 1861 and in 1864, 1865, 1866, 1867 and 1868, individuals paid for sewers $250,608.12.

On the 1st May 1861, an act was passed repealing the act authorizing the city to levy a *tax*, or charge, on the front foot for constructing culverts, which power was restored to them by the act of 8th April 1864. For the two last years, 1867 and 1868, the average annual localized taxation, for construction of sewers, was over $61,000.

This whole front foot taxation, for paving water-pipes and sewers, is extended over the whole consolidated city, and yet at this period of time, after a successful trial of it for nearly three-quarters of a century, this court is asked to declare the whole system unconstitutional; and that a systematic collection of taxes during that whole time, amounting to over $8,000,000, has been illegal and unconstitutional, and of course, in common honesty, should be repaid by funds raised by general taxation.

If these taxes are unconstitutional, then all our expenditure for paving, sewerage and water-pipes, must be raised by general taxation, which must make a very heavy increase to our present rate of taxation, which is already oppressive, and this for the benefit of a few gentlemen whose property has been largely enhanced in

[Hammett *v.* Philadelphia.]

value by the very pavement they complain of, and which many of them originally favored.

In paying for iron water-pipes, certain prices were fixed for the front foot, apparently arbitrary, but really founded upon an ascertained cost of all sizes of pipes laid in the district. In all the outer districts, except Southwark and Moyamensing, it was $1 per foot on each side, as above stated, and in the two exceptions 80 cents.

These prices were fixed by the authorities of each district, and did not represent the actual cost in each individual case, but an estimated average cost throughout the whole of the outer districts excepting two southern ones.

It was the same really in paving and sewerage. The legislature therefore fixed, by law, in 1855, certain prices per lineal foot, for paving, sewers and water-pipes, which were probably, nay certainly, above or below the actual cost.

The power of general taxation in the city is limited only by the defined purposes to which the money may be applied. The rate may be one or five per cent., but it has never been thought unconstitutional because no specified rate has been named, beyond which they shall not go. Before the Act of 1855, the prices were fixed by the authorities, and that is all that is done here under the Act of 1866. The councils, upon a full consideration, occupying some months, make a contract at a sum certain, upon the same terms as the city of Albany did with the Nicolson patentees last October, where the owners are taxed by the front foot: " Resolved that the price of the ' wood-block ' or Nicolson pavement, to be laid on Broadway, be limited to not exceed four dollars per square yard. " (Journal of Councils of Albany.)

The streets are paved by general or localized taxation, and together there are between five and six millions of square yards of pavement. If, in repaving or repairing, any of the loose stones are stolen, as whose property are they to be laid in the indictment for the larceny ?

And the same question may be asked as to the water-pipes and sewers, for they are paid for in the same way and by the same persons. If the stones and gravel belong to the opposite owners, upon the same principle the water-pipes and sewers belong to the same persons, the only difference being, that the individual owner may own one whole cobble-stone, whilst he can only own the half of a piece of water-pipe and the half of a piece of a sewer.

Such a proposition would introduce perhaps fifty thousand separate owners of pieces of pavement, pieces of water-pipe, and pieces of sewers, rendering all civil and criminal remedies entirely nugatory.

The policy of this court in regard to public improvements by municipal corporations, has been of the most liberal character,

and wherever there has been a failure to comply with any indispensable requisitions, it has been remedied by the healing power of legislation. I have examined this case carefully, and I discover nothing in it to prevent the owners of property on this part of Broad street, from paying the contract price, for the best and most admired pavement ever laid in this city, and which has made this street—far removed from the business centre—one of our most popular and crowded thoroughfares.

Since writing the foregoing, I have listened attentively to my brother Sharswood's opinion, in which he declares the Act of 23d March 1866 authorizing the improvement of Broad street, to be unconstitutional, because after a street is once paved, it cannot be repaved, repaired or amended, at the expense of the owners of property abutting upon said street. It would seem, therefore, to follow, that the law is not unconstitutional so far as it relates to Broad street, north of Columbia Avenue, nor South Broad street, as paved south of Washington Avenue. The ground assumed is, that the legislature cannot order directly or delegate the power to the municipal authorities to order a street once paved to be repaved, repaired or amended, at the cost of the owners of property abutting upon the street, although it may raise the value of the identical property one hundred per cent.

If this be the law, then the parts of Broad street excluded from the benefit of the act, are the paved portions from Columbia Avenue southward to Snyder street, a distance of nearly four miles. This is a restriction of legislative power never heard of before in this state, nor, I believe, in the state of New York; for the law passed by the common council of Albany, "for repaving Broadway with the Nicolson or Belgian pavement," was in pursuance of the power vested in them by section 45 of the Act of April 12th 1842, of the legislature of New York, which is the charter of the city of Albany, "to order and direct the reducing, filling, levelling, pitching, planking, paving, macadamizing or covering, with broken stone, gravel, or sand, any of the streets or roads in said city, or the altering, repairing or repaving of the same."

From the language of the Act of William and Mary, it would seem (as it still is in some parts of London) the streets were paved from house to house, with the gutter or channel in the middle of the street, without any sidewalk, a custom prevailing also in Paris. The repaving or repairing extended, therefore, over the whole street, and was at the cost of the householders on it. It is difficult, therefore, to see how a practice established in London when this state was a colony, and recognised in our early laws, should at this day be pronounced unconstitutional, as beyond the power of the legislature of a sovereign state.

"In cities the sidewalks are considered a part of the public

15 P. F. SMITH—12

[Hammett *v.* Philadelphia.]

streets, and as such are to be kept, like the streets themselves, in a safe and convenient state of repair through their entire width:" Angell on Highways 304. A 50-foot street has a 26-foot cartway, and 12-foot sidewalks on each side; and certainly since 1769, a period of one hundred years, these foot pavements, comprising almost half the street, have always been paved, repaired and amended, at the expense of the owners of the lot in front of which they are. It is singular, therefore, if the legislature does not possess the same power over the remaining part of the street, intended for animals and vehicles.

The uses and purposes expressed in the preamble of the act to which Broad street is to be devoted, are not only strictly constitutional, but highly praiseworthy. They are to make and for ever maintain Broad street, for its entire length—as the same is now opened, or may hereafter be opened—the principal avenue of the city, and to keep and preserve the said street for ever, free from and unobstructed by railroad tracks extending along the same, as well as for the purpose of enabling and authorizing the said city to remove or cause to be removed, all railroad and railway tracks, and other obstructions laid or constructed along the same, and in improving its uses for public services. There is certainly no violation of the constitution in all this.

The city is authorized and required to occupy and appropriate Broad street, in the city of Philadelphia, for its length, as the same is now opened or may hereafter be opened, and " from curb to curb thereof, for the uses and purposes of a public drive, carriage-way, street or avenue, and to improve the said street or portions thereof, from time to time, and in whole or in part with such mode of pavement, paving, macadamizing, gravelling or other roadway, as may in the judgment of the select and common councils of said city be best adapted to and for the uses and purposes aforesaid." All this, which affects only the cartway which is used by man and beast, is acknowledged to be within the constitutional power of the legislature, which has jurisdiction of all subjects on which its legislation is not prohibited, and whose power to make laws is absolute, unless restrained by some constitutional limitation—and there is no limitation in the constitution on the taxing power.

Then comes the clause upon which it is declared that this law is unconstitutional: " and for that purpose the said councils have, and are hereby authorized to enact such ordinances or resolutions, with such conditions or stipulations as may require the cost of said improvements to be paid for by the owners of property abutting upon said street."

The objection to this provision is, that having been once paved with cobble-stones—a most objectionable and miserable pavement for a great public drive or avenue—at the expense of the owners

[Hammett *v.* Philadelphia.]

on each side of it, it can never be ordered by the legislature to be repaved at any time, or in any event, at the cost of the same persons, but that it must be done at the expense of the whole population of the city. This limitation of the taxing power is nowhere to be found in the constitution; and, if the assertion, that it cannot be done, is correct, then all repaving or repairing of the footways or sidewalks throughout the whole city, and in the other cities and boroughs of the Commonwealth, at the expense of the owners of property, in front of which they are, for the last hundred years, has been, and is now, unconstitutional.

The legislature can authorize a steam railroad through Broad street, with as many tracks as they please, occupying the whole width of the street, but they cannot require the owners of property on it to repave in front of their lots! This is certainly very extraordinary!

The legislature raised, and officered, and armed, and equipped for service, the twelve regiments of the Pennsylvania Reserves, and the school directors of each and every ward and borough, were fully empowered to assess and collect taxes to pay bounties to volunteers, and to issue bonds in payment of the same.

The governor is the commander-in-chief of the army and navy of the Commonwealth, and of the militia. And the state may keep troops and ships of war in time of war, and, in certain emergencies, may raise troops to repel invasions or suppress insurrections: Luther *v.* Borden, 7 How. 7.

Our judiciary is complete, from the justice of the peace to the Supreme Court, for the administration of the civil and criminal law; and the legislative power is vested in the General Assembly, consisting of the Senate and House of Representatives, unrestrained by anything except by the Constitution of the United States, or by the positive prohibitions or limitations of the state constitution.

"It has never been questioned, so far as I know," says Redfield, C. J., "that the American legislatures have the same unlimited power, in regard to legislation, which resides in the British Parliament, except where they are restrained by written constitutions."

This legislature, so powerful, which can vacate a street, cannot order it to be repaved at the expense of the owners abutting upon it!

The theory of local benefit has been settled by the legislature to mean the front foot on the street. The benefit to such owners is positive and certain. But it is said there is no evidence of benefit before us. Are we to shut our eyes in order to declare a law unconstitutional? I have shown the vast benefit to the owners called upon to pay, in the increased value of the very identical·

[Hammett *v.* Philadelphia.]

property itself, and in freeing the street for ever from railroads and railway tracks.

The benefit to them, every one can understand and appreciate, but how there is such direct benefit to the inhabitants of Kensington or Southwark or West Philadelphia, it is difficult to imagine.

The effect of the decision will be that, in all the paved portions of Broad street, and of the city, there can be neither Nicolson nor Belgian pavement, whilst all the unpaved portions of Broad street (seven and a half miles), and of other parts of the city, may be paved with either one or the other of the improved pavements of the present generation.

Another effect of declaring this law unconstitutional, will be, that next winter a steam railroad may be laid on Broad street by the same class of gentlemen who are always ready to furnish the public with what they neither require nor ask for.

I am of opinion that the Act of 23d of March 1866 is clearly constitutional, and I would affirm this judgment.

---

Mr. Justice READ, on the 2d of July 1869, filed the following additional opinion:—The question of constitutionality of the Act of 23d March 1866, was very imperfectly argued by both sides, as will be seen by reference to the paper-book of the plaintiff in error, and the reply to the paper-book of the defendants in error, in which there was not a single authority cited bearing upon this special view of the case. And, if my recollection is correct, but two cases were cited on the oral argument, which really had no application, although quoted by counsel as in point. The paper-book of the defendants in error, on this point, contained but three citations, all from our own books, although upon other branches of the argument, there were other citations from our reports, sustaining the same views. Upon a perusal of the printed arguments on both sides, it appears that the principal stress was laid upon matters entirely independent of the constitutional question.

Under these circumstances, and without the benefit of a full and exhaustive argument, the first part of my opinion was written to lay before my brethren my views, and the last after hearing the opinion of my brother Sharswood. I have since then made a fuller examination of the authorities, which I shall now proceed to discuss.

The city of New York had two charters from governors of the crown, granting very large and extensive rights and privileges before the American Revolution: one from Governor Dongan, in 1686, and the other from Governor Montgomerie, in 1730. Chancellor Kent, in his notes upon the charter, prepared at the request of the common council, and published under their directions, says: " The statute powers have become so ample, so various and so full

of direction, that the charter power seems to be in a great measure absorbed and lost in the new statute powers; but whenever and wherever the statute provisions do not supply precise and adequate authority, in the given instance, the common council can always resort to the never-failing powers under the charter, which gives broad and large authority commensurate to every case." This observation is contained in a note to the 16th section, which it describes thus: "The 16th section gave to the common council power to establish, direct, lay out, alter, repair and amend streets, lanes, alleys, highways, watercourses and bridges, throughout the city and island."

By the 4th section of the Act of 16th April 1787, the common council were authorized "to cause common sewers, drains and vaults to be made and constructed in any part of the city, and to order and direct the pitching and paving the streets thereof, and the cutting into any drain or sewer already made, or to be made; and the altering, amending, cleansing and scouring of any street, vault, sink or common sewer, within the said city."

The common council are to cause to be made an estimate of the expenses, and a just and equitable assessment thereof among the owners or occupants of all the houses and lots intended to be benefited thereby; "and such owners or occupants respectively," shall, upon demand, pay the sum at which such houses or lots shall be so assessed, to be applied to the purposes aforesaid, and in default of payment a remedy is provided for its recovery.

In the 11th section of the Act of 3d April 1801, the same provision is make for local assessments for common sewers and paving, and for making, altering, amending, pitching, paving, cleansing and scouring such streets, and making and repairing such vaults, drains and sewers, as aforesaid.

On the 9th of April 1813, an act was passed "to reduce several laws, relating particularly to the city of New York, into one act." This act contains three hundred and fifteen sections, and was drawn by Hon. Samuel Jones, afterwards Chancellor of the state, and Chief Justice of the Superior Court of the city of New York; and forms the groundwork of all the city legislation, and has stood the test of the most critical legal examination. The street paving and sewers, and the altering, amending, cleansing and scouring the same, with the local assessments of the expenses on the owners or occupants of houses and lots to be benefited thereby, are provided for in the 175th and 176th sections (Valentine's edition, Laws City N. Y., p. 526), and are modelled on the Acts of 1787 and 1801, and by the 223d section (Id. p. 555) these assessments are made "a lien or charge upon the houses and lots, in respect to which such assessments shall have been made." In note I. to page 527 in the Appendix, p. 1240, it is stated, and such undoubtedly is the law, that the estimates and assessments may be

made either before or after the work is done, and each method is equally legal: Manice *v.* Mayor of N. Y., 4 Selden 120. These are the assessments which, in the case in 4 Comstock 419, are decided to be taxes, and are an exercise of the power of taxation vested in the state government. In Brewster *v.* City of Syracuse, 5 Smith 116, 19 N. Y., the Court of Appeals, Johnson, C. J., delivering the opinion of the court, and all the judges concurring, said, " There was in law no contract between the constructors of the sewer, and the persons assessed to pay for it. The sewer was constructed under authority conferred by the legislature on the city of Syracuse, and the expense was imposed on that part of the citizens interested in the improvement, by virtue of the discretionary power of the legislature to impose the public burdens on those who, in its judgment, in justice ought to bear them. The nature of the power was fully examined in The People *v.* Mayor of Brooklyn, 4 Comst. 419, and it was declared to be a part of the legitimate exercise of the state's power of taxation to ascertain, *subject to no judicial review,* the public burdens to be borne, and the persons or classes of persons who were to bear them."

In the matter of the petition of the Trustees of the N. Y. Protestant Episcopal School, 4 Tiffany 574 (31 N. Y.) Denio, C. J., said, page 482: " The whole doctrine of assessments for local improvements, was elaborately considered in a very interesting opinion prepared by Judge Ruggles, in which the views of the Supreme Court on the first-mentioned case" (6 Barb. 209), " were carefully examined, and this court, with the concurrence of all the judges, reversed the judgment appealed from. It was held that raising money for a local improvement was an exercise of the taxing power inherent in the legislature, and that this power of taxation implied a power to apportion the tax (territorially), as the legislature should see fit, and moreover that this power of apportioning had no limit where there was no constitutional restraint, and that the constitutional inhibition against depriving a person of life, liberty or property, without due process of law, and forbidding private property from being taken for public use, without just compensation, had no application to the case." The whole opinion of this learned judge is illustrative of the really unlimited power of the legislature over this species of local taxation. In Howell *v.* City of Buffalo, 10 Tiffany 267 (37 N. Y.), September Term 1867, the ground taken was, that the act under which a reassessment of plaintiff's land was made, was unconstitutional and void. The Court of Appeals unanimously held it to be constitutional, and reaffirmed in strong language the doctrine in 4 Comstock 419 and kindred cases.

This is the settled doctrine of the New York courts.

In the matter of the petition of John W. Lewis, to vacate

[Hammett v. Philadelphia.]

assessment for regulating West street, 51 Barbour 82, Ingraham, J., delivering the opinion of the court said : "The first objection is, that the common council have no authority to assess for repairing a street. The power to assess the expense of paving a street is admitted to exist under sections 175 and 176 of Act 1813 (2 R. L. p. 407). The subsequent authority of the common council to repair the streets, and employ the persons therefor, in sections 193, 194 and 195, does not prevent the charging the expense thereof to the owner. Even if it did it would not apply to this case of an entirely new pavement after raising and altering the grade. Either repairing or repaving may be, under these sections, made a charge upon the property."

In Astor v. The Mayor, &c., and Peter Dolan v. The Mayor, in the Supreme Court of New York, on the 8th of February 1869, ordinances passed to pave Thirty-third street with Nicolson pavement, and to pave the Seventh Avenue with Stafford pavement, were held legal, and injunctions to prevent them were either dissolved or refused.

This construction of the charter and laws, and of the power of the legislature over special and local taxation for local improvements, has been uniformly maintained under the several constitutions of 1787, 1821 and 1846, notwithstanding the 9th section of the 8th article of the last-named instrument.

In the case of The State v. Council of Elizabeth, reported in the Supreme Court of New Jersey, in 1 Vroom 365, and in the Court of Errors and Appeals, in 2 Vroom 547, which was a certiorari to set aside an assessment for paving a street under authority of the city council of the city of Elizabeth, the Court of Errors said, page 551 : "It is further objected to the assessment that it was made by the lineal foot, and not in proportion to the benefits. The act requires the commissioners to make a just and equitable assessment of the whole amount of the costs and expenses upon the owners of the land and real estate upon the line of the street. The assessment appears to have been made by the lineal foot; but there is no evidence that such was not the mode most just and equitable. Had the owners themselves been required to do the work, that would have been the proportion of the expense.

"The assessment was not made against the owners of land in any other street, for the simple reason that the act requires it to be upon the owners of land on the line of the street improved. It necessarily included the expense of paving on the streets which crossed First street. It would have been a poor improvement of a street to pave in front of the blocks and leave the parts of it crossing intersected streets unpaved.

"Parts of the former flagging and guttering were removed and replaced by other work; but by the testimony that appears to

[Hammett *v.* Philadelphia.]

have been necessary, in order to complete the improvement in a workmanlike manner."

The mode of contracting for the work, and the terms of payment were also approved, and the expenses of grading the street were properly included in the assessment. In The State *v.* City of New Brunswick, 1 Vroom 397, it is said: "But if in their judgment the health, comfort, convenience or prosperity of the city requires it, they may order the street to be regulated, graded and paved at the expense of the owners or occupants of the lots *fronting on it*; and it is no excuse for the owners to say that the rights of the turnpike company are infringed."

In The Mayor and City Councils of Baltimore *v.* The Proprietors of Green Mount Cemetery, 7 Md. 517, the court recognises a paving assessment as a tax, and held that the imposition of a paving tax is an exercise of the taxing power, and not of the right of eminent domain. In this case the assessment was by the front foot of the property abutting on the street or avenue so paved. The decision that it was a tax was supported by all the earlier authorities in that state. The same doctrine is repeated in Howard *v.* The First Independent Church of Baltimore, 18 Md. 451, June 7th 1862.

In Creighton *v.* Scott, 14 Ohio N. S. 438, it was held, where part only of a street is improved, the city council have power to assess the expense of making such improvement upon the lots or land abutting on the part of the street improved; and when in making such improvement, squares formed by the intersection of other streets are crossed and improved, the city council may, if the object of improving the squares is the improvement of such street, assess the whole expenses upon the same property on which the other expenses of such improvements are assessed.

By the 18th section of the Act of 11th March 1853 (Curwin's Laws of Ohio, p. 1368) the municipal corporations named have power to lay off, extend and establish, improve and keep in order, and repair streets, and to assess and collect a charge on the lots or lands, through or by which a street shall pass, for the purpose of defraying the expenses of constructing and repairing or lighting such street. The charge is required to be in proportion either to the feet front of the lot or land abutting on such streets, or to the value of the lot or land as assessed for general taxation.

If the corporation elects to charge by the feet front, then all paving, repaving and repairing are paid by the owners abutting on the street by the front foot.

In Iowa, in Buell *v.* Ball, 20 Iowa 292, the following clause in the charter of Lyons City is given: "14. To cause the streets and alleys of the city to be paved, and the pavements to be repaired; and for that end it may require the owners of lots adjacent to which it is to be done, to pave and repair one-half in width of

[Hammett *v.* Philadelphia.]

the street contiguous to their respective lots; and in case of neglect, after a reasonable time named in the order, the same may be done by the city, and the expenses may be assessed on such lots, which shall have the effect of a tax levied thereon; and they may be sold therefor as for a tax, subject to the same right of redemption."

This was a perfectly constitutional provision in Iowa.

In the City of St. Louis to use of Lohrum *v.* Coons, 37 Mo. 44 (October Term 1865), it was held, that the Act of the General Assembly of January 16th 1860, § 2, which authorized the city of St. Louis to assess the costs of macadamizing streets against the owners of property fronting upon such streets, and providing that the certificate of the city engineer shall be primâ facie evidence of the validity of the charge against the property, and of the liability of the party therein named as owner, is constitutional.

In The City of St. Louis for use of McGrath & Cahill *v.* James Clemens, Jr., 36 Mo. 467, Holmes, J., delivering the opinion of the court, said: "All question of the constitutionality of acts of this nature must now be considered as settled by the repeated adjudications of this court in similar cases:" Egyptian Levee Co. *v.* Hardin, 27 Mo. 495; City of St. Joseph *v.* Anthony, 30 Id. 537.

In Barnes and Others *v.* Mayor and City Council of Atchison and Others, 2 Banks (Kansas) 455, it was held, that the charter of the city of Atchison, authorizing the levy of a special tax on the holders of lots on every street, for the improvement of such street, to be levied by the front foot, or by the assessed value thereof, was legal. This was under the territorial government; and it was held that section 24 of the organic act conferred upon the territory all the legislative powers of a state government, unrestricted by its constitution, except in particulars not affecting the question before the court, and that the granting of municipal powers, including powers of local taxation for improvements of streets, &c., is an ordinary act of legislation, and was within the power of the territorial legislature to grant.

In Hines *v.* City of Leavenworth and Others, 3 Banks (Kansas) 186, under the state constitution, which has peculiar provisions as to assessments for local improvement and general taxation, it was held that, under the general grant of power, the legislature may authorize charges upon adjacent property for improvements of streets in a city.

The observation of Chief Justice Crozier, on page 202, &c., "That the injustice of assessing the property all over a city, for the improvement of a single street, must be apparent at a glance," with his accompanying remarks, are well worthy of attention.

In Myrick *v.* The City of La Crosse *et al.*, 17 Wis. 442, it appears that special assessments for the improvement of streets

are made by the street commissioners; and if, upon notice, the owner or occupant of the lot does not do the work, it is to be done under contract with the commissioners, and the owner of the lot is charged with it.

By referring to Henry McGuinn *v.* Michel Peri, 16 La. Ann. Rep. 326, and John Coleman *v.* Poydras Asylum, 17 Id. 325, it appears that in New Orleans, the streets are paved at the expense of the owners of real property fronting on such streets.

This is the law also in Michigan.

In Emery *v.* San Francisco Gas Company, 28 California 345, it was held that an assessment upon the different lots fronting on a street in a city, in proportion to the number of feet frontage of each, for the purpose of raising money to pay the expenses of grading and macadamizing the street, is an exercise of the sovereign right of taxation, and not of the power to appropriate private property to public use, under the right of eminent domain; and it rests in the discretion of the legislature to say upon what principle the assessment on lots fronting on a street, to pay for improvements on the street, shall be apportioned among the lots. The opinion of the court was delivered by Mr. Justice Sawyer, and is a most elaborate and careful discussion of the whole subject, with a full review of the authorities, and sustains all the positions in Judge Ruggles's admirable opinion, in 4 Comstock 419.

In Walsh *v.* Mathews, 29 California 123, and Emery *v.* Bradford, Id. 75, it was held, that the contractor is entitled to a lien on a lot in San Francisco, and to a personal judgment against the owner, for the amount of an assessment, levied on the same for work done on the street in front of the same. In the last case, Emery *v.* San Francisco Gas Company was affirmed. Two judges dissented, one upon the ground that it was unconstitutional to make the owner of the lot personally responsible, the other upon matters peculiar to the case itself.

I am aware that in Taylor *v.* Palmer, 31 California 240, it has been decided—two judges dissenting—that making the owner *personally* liable for a street assessment, is unconstitutional, and that there is a difference, in kind, between the two kinds of taxation— assessment taxation, by municipal corporations, for street improvements, and taxation generally, arising from special provisions in the constitution of the state—the word assessment receiving a limited construction, from its use in the 37th section of the 4th article of the constitution, which is a *verbatim* copy of the 9th section of the 8th article of the constitution of New York.

By the 13th section of the 11th article of the constitution, "Taxation shall be equal and uniform throughout the state," a provision not to be found in the New York constitution.

Mr. Justice Sanderson, delivering the opinion of the majority (page 252), uses this forcible language:—

[Hammett v. Philadelphia.]

"The power of taxation is a power which the legislature takes from the law of its creation; for it is an indispensable power, without which it would become impossible for that body to perform its functions; or, in other words, the power does not come from the constitution. That instrument, so far as it deals with the subject, as is well understood, is not a grant but a limitation. Take away the constitutional limitations—which are, that the burden must be apportioned upon the *ad valorem* principle, and made to operate equally and uniformly—and the legislature would be enabled to enforce the power of taxation by the mode designated by the word 'assessment;' but, with the *ad valorem* limitation, it cannot, for thereby a different mode is prescribed, and the legislature is limited to that mode."

It will be perceived, therefore, that the court adopted an obsolete meaning of the word assessment, entirely discarded by the New York courts in their construction of the very same clause.

We have neither the word "assessment" nor the *ad valorem* clause in our constitution, and therefore the case of Emery *v.* San Francisco Gas Company is for us perfectly sound law, and on all-fours with the decisions in New York and our sister states. The dissenting opinions of Justices Sawyer and Shafter (31 California 257, 258 and 666), are well worthy of an attentive perusal.

In People *v.* McCreery, 34 California 432, the effect of the *ad-valorem* clause was held to be, "that under the constitution, the legislature has no power to exempt from taxation any private property whatever" (p. 463); and the effect was to strike out all the exemptions contained in the Revenue Act, and it was to be read as if they were not in it.

Mercer street, in New York, has been *repaved* with the Nicolson pavement. The resolution to pave the street with Nicolson pavement, was passed by the Common Council and signed by the mayor in June, 1867. The surveyor made his report of the amount of surface, &c., to be done in October, and a contract was made by the Croton Aqueduct Board at $4.75 per square yard: New Bridge stones at 95 cents, old ditto, relaid, at 10 cents per square yard. When done the inspector's certificate to that effect and all the other papers go to the Bureau, who make up the gross amount, and divide it among the owners of the property on the street at so much per lineal foot, with an extra charge on corner lots, and a small proportion on lots on cross streets near the corners.

| | |
|---|---|
| The Mercer street contract was, . . . | $64,875.25 |
| The surveying 1006, inspecting 291.31, advertising, 140, collection, 1700, . . . . . | 3,137.31 |
| Total, . . . . | $68,012.56 |
| On corner lot, 25 × 100 feet, . . . . | $233.01 |
| Middle lot, ditto, . . . . . . | 215.70 |

[Hammett *v.* Philadelphia.]

I have two blanks of notices issued by the bureau of collection of assessment.

1. Notice of confirmation of assessment on a day certain, and payment is expected to be made on or before such day, and unless paid on or before that day interest will be charged at the rate of seven per cent. from the date of confirmation.

2. Notice, if not paid under the first notice on a day certain, it will be sent to the clerk of arrears, when interest at the rate of twelve per cent. will be charged from the date of confirmation.

All the assessments on this street have been paid. I am indebted for this information to the kindness of two friends, and the politeness of the New York officials.

The established practice of the cities of Albany and New York, and the decisions of the New York courts, prove beyond all question that the legislature of that state have and do exercise the power to authorize those municipalities to repave already paved streets with Nicolson, Stafford, Belgian or any other species of improved pavement, whether patented or not.

By "an act relative to street paving in the city of Philadelphia," passed 18th April 1867, Pamph. L. 1303, "whenever a majority of the property-owners of any block or square, in the city of Philadelphia, shall petition councils, asking that the character of the street paving, upon the said block or square may be changed, it shall be lawful for the said councils to direct such work to be done in accordance with said petition; and the cost thereof shall be a lien upon all the property fronting upon said block or square."

By the 6th section of "an act concerning streets and sewers in the city of Pittsburg," passed the 6th of January 1864, Pamph. L. 1133, "The said councils are hereby authorized, whenever they may deem the same necessary, to cause to be graded, regraded, paved, repaved or macadamized any public street, lane or alley, or any parts thereof, which is now or which may hereafter be laid out and opened in said city, or which may be in whole or in part boundaries of said city, and to have the same set with curbstone; and the said councils are hereby authorized to levy and collect the cost and expense of the same from the owners of property bounding or abutting on the portions of said streets, lanes or alleys thus improved, by an assessment of an equal sum per foot front of said properties."

Upon the argument neither of these Acts of Assembly were brought to the notice of the court, and yet upon the principles adopted by the court they are clearly unconstitutional. In the one case it would affect all repavements within the last two years, and in the other all within the last five years, besides affecting those in progress at this time, and preventing all further improvements in old streets. It must stop in both cities all future im-

[Hammett *v.* Philadelphia.]

provement by the introduction of any new or improved pavement of any kind, even as in Broad street, between Arch and Vine streets, where the present carriage-way and sidewalks are in a state of utter ruin, and a disgrace to any civilized community.

The case was reargued before a full bench May 28th 1870.

On the 7th of July 1870, SHARSWOOD, J., announced the following judgment:—

This case having been reargued, it is now ordered that the former decision be approved, and the judgment heretofore entered stand as the judgment of this court.

READ and WILLIAMS, JJ., dissented.